# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| BEN TAL, LIAM TRAYNOR, JORDAN ANCEL, DAVID ROSEN, NICHOLAS TINKLE, AMADEO BALTAZAR, DAVID RAYMOND, JEFFREY LIN, JON LATANE, TIMOTHY KAISER, JOSEPH HSU, and VICTOR TORRES-VELEZ, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 1:25-cv-6508 |
| Plaintiffs, | ) ) | **CLASS ACTION COMPLAINT** |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| HUEL INC., a Delaware corporation, | ) ) ) | |
| Defendant. | ) ) ) | |

Plaintiffs Ben Tal, Liam Taylor, Jordan Ancel, David Rosen, Nicholas Tinkle, Amadeo Baltazar, David Raymond, Jeffrey Lin, Jon Latane, Timothy Kaiser, Joseph Hsu, and Victor Torres-Velez (collectively, "Plaintiffs"), individually and on behalf of all other similarly situated persons, bring this class action against Huel Inc. ("Defendant" or "Huel") to obtain declaratory and equitable relief, damages, restitution, and disgorgement in connection with Defendant's practices in manufacturing, designing, distributing, supplying, marketing, promoting, advertising, and selling Huel Black Edition High-protein complete meal ("Huel Black")[1] contaminated with

---

[1] Because discovery may reveal other Huel products similarly contained heavy metals, Plaintiffs reserve the right to amend this Complaint to include any such additional products.

1

dangerous levels of toxic lead and cadmium, for personal, family, or household use.[2]  Plaintiffs make the following allegations based on personal knowledge as to their own circumstances and on information and belief as to all other matters, including investigation conducted by their attorneys:

## NATURE OF THE CASE

1.      Defendant Huel manufactures, designs, distributes, supplies, markets, promotes, advertises, and sells Huel Black as a healthy, vegan, high protein alternative to traditional meals that has "all the protein, fiber, fatty acids, carbohydrates and all 27 vitamins and minerals that you need or your body needs to live off."[3]

2.      Huel recognizes that its focus on health is important to consumers, assuring them that "science and nutrition are at the heart of what we do at Huel, so it's pretty important that we walk the walk when it comes to talking about how healthy Huel is"[4] and that "at each step of the [manufacturing] process, we go above and beyond industry standards."[5]

3.      "Americans' obsession with protein has transformed what had been a niche product into the centerpiece of a multibillion-dollar wellness craze, driving booming supplement sales and spawning a new crop of protein-fortified foods that now saturate supermarket shelves and social media feeds."[6]

---

[2] Because discovery may reveal the presence of other heavy-metal contaminants, Plaintiffs reserve the right to amend this Complaint to include any such additional heavy metals.

[3] Julia Limitone, *Huel CEO says firm's plant-based meals have everything your body needs to live*, FOXBusiness (Aug. 22, 2019) https://www.foxbusiness.com/features/huel-ceo-plant-based-meals-body-needs (last visited Nov. 20, 2025).

[4] https://huel.com/pages/health-benefits.

[5] https://huel.com/pages/quality-standards.

[6] Paris Martineau, *Protein Powders and Shakes Contain High Levels of Lead*, Consumer Reports, https://www.consumerreports.org/lead/protein-powders-and-shakes-contain-high-levels-of-lead-a4206364640/ (last visited Oct. 20, 2025).

4.      In recent years, there has been burgeoning demand for different types of vegan food products from health- and eco-conscious target consumers.  This rising consumer awareness regarding the health benefits of vegan protein over animal protein is boosting the growth of the vegan protein powder market.

5.      Huel capitalized on these trends in its advertising and marketing, but despite assuring consumers that Huel "uphold[s] the highest standards, with rigorous ingredient testing ensuring consistent quality, flavor, and nutrition in every meal,"[7] Huel Black contains hazardous concentrations of toxic and carcinogenic lead and cadmium.

6.      Defendant knew or, at a minimum, should have known that Huel Black contained elevated, dangerous, and unhealthy levels of lead and cadmium, but nevertheless marketed and sold those products in retail stores and online, in violation of its statutory and common-law duties.

7.      Defendant's representations—including on its websites, product labels, social media, and other marketing materials—lead reasonable consumers to believe that they are purchasing premium, healthy products that were "rigorously tested" for heavy metals and "validated for quality and nutrition" to meet Huel's "strict standards," including that the products are free from harmful heavy metals.[8]

8.      Defendant's representations are, at best, misleading, because Huel Black contains dangerous levels of lead and cadmium in such amounts that experts advise against Huel Black's consumption.  The presence of lead and cadmium in Huel Black is not fully and fairly disclosed to consumers.

---

[7] https://web.archive.org/web/20250124070347/https://huel.com/pages/why-huel.

[8] *See, e.g.*, https://huel.com/pages/quality-standards ("All Huel products are routinely tested for micro, allergens, heavy metals, and pesticides. We have sampling teams in the UK and US, using certified labs UKAS and FDA-compliant standards. Our in-house NIR tech also enables advanced quality testing when needed.").

9.    Worse still, Defendant represented "Huel is safe for children above 4 years of age" and "fine to have during pregnancy."[9]  Children and pregnant individuals are most vulnerable to the serious adverse health effects known to be associated with exposure to or consumption of lead and cadmium.

10.    On October 14, 2025, Consumer Reports published an investigative report titled "Protein Powders and Shakes Contain High Levels of Lead" (the "Report") exposing that Huel Black contains "more lead in a single serving than our experts say is safe to have in a day."[10]

11.    Consumer Report's testing confirmed that Huel Black not only contained lead, but "contained enough lead that [their] experts advise against consuming them."  Specifically, "Huel's Black Edition powder contained 6.3 micrograms of lead, or about **1,290 percent** of CR's daily lead limit."[11]

12.    No amount of lead is safe for human consumption or exposure.[12]  Lead can cause health problems in almost every organ and system in your body.  Exposure to lead can cause damage to the kidneys, anemia (low iron in the blood), and increases in blood pressure.  Long-term exposure to lead can also result in cognitive deficits, such as decreased learning, memory, and attention.  Exposure to high lead levels can severely damage the brain and kidneys, cause a

---

[9] https://huel.com/pages/faq.

[10] Paris Martineau, *Protein Powders and Shakes Contain High Levels of Lead*, Consumer Reports, https://www.consumerreports.org/lead/protein-powders-and-shakes-contain-high-levels-of-lead-a4206364640/ (last visited Oct. 20, 2025).

[11] *Id.* (emphasis added).

[12] Lead is a highly toxic heavy metal, used in the production of batteries, ammunition, and metal products such as solder and pipes.  Lead is an element, which means it does not break down. Because of health concerns with human exposure to lead, the use of lead in paints, ceramic products, caulking, and pipe solder has been dramatically reduced, and the use of lead as an additive to automobile gasoline was banned in the United States in 1996. Agency for Toxic Substances and Disease Registry (ATSDR), Division of Toxicology and Human Health Services, *Lead – ToxFAQs*, *available at* https://www.atsdr.cdc.gov/toxfaqs/tfacts13.pdf.

miscarriage in pregnant women, damage male reproductive organs, and can cause death. Consequently, people are cautioned to avoid exposure to lead.

13.     Cadmium, too, is a known carcinogen.  Oral ingestion of cadmium is known to cause death, as well as serious, adverse cardiovascular, gastrointestinal, hematological, musculoskeletal, renal (kidney), neurological, reproductive, and developmental effects.

14.     Defendant had a duty to prevent potentially dangerous concentrations of lead and cadmium from contaminating its products, to prevent chronically exposing Huel Black consumers to potentially dangerous levels of lead and cadmium, and to adequately disclose and warn consumers that Huel Black contained potentially dangerous concentrations of lead.

15.     Defendant was and remains aware that:

- Consumers of its Huel Black product are extremely concerned about exposure to toxins and heavy metals, including lead and cadmium.

- Consumers of Huel Black reasonably expect the product to be healthy, rigorously tested, and free from heavy metals.[13]

- Consumers of Huel Black reasonably believed they were purchasing a premium and healthy protein-based meal replacement, that were healthy to consumer multiple times per day.

16.     Through its testing of its Huel Black products, Defendant knew that they contained lead and cadmium, but did not disclose this information to consumers or reconfigure its product to be heavy-metal free.

17.     That Huel Black contained toxic lead and cadmium is information that was not available to Plaintiffs, Class Members, or the public, who lack the knowledge and opportunity to

---

[13] Since Consumer Reports published its report, Huel has added a new disclosure to its web site that its products may contain lead.

determine whether Huel's protein powders contained lead and cadmium, and, thus, relied on Defendant to fully and accurately represent the contents of Huel Black.

18.    Had Defendant accurately and fully disclosed to Plaintiffs and Class Members that Huel Black contained and contains lead and cadmium, Plaintiffs and Class Members would not have purchased Huel Black, or they would have paid significantly less for the product.

19.    As a direct and proximate result of Defendant's inclusion of lead and cadmium in its Huel Black product and misleading disclosures and material omissions, Plaintiffs and absent Class Members have suffered and will continue to suffer serious injury.

20.    By engaging in the conduct set forth herein, Defendant has: (a) violated New York Agriculture and Markets Law § 199-a; (b) breached its implied warranties[14]; (c) breached its express warranties; (d) been unjustly enriched; (e) engaged in fraud by omission; (f) violated New York General Business Law §§ 349, 350; (g) violated California Bus. & Prof. Code § 17200; (h) violated California Bus. & Prof. Code § 17500; (i) violated California Civ. Code § 1750 *et seq*., (j) violated Florida Stat. § 501.201 *et seq*.; (k) violated New Jersey Rev. Stat. § 56:8-1 *et seq*.; (l) violated North Carolina Gen. Stat. § 75-1.1 *et seq*.; (m) violated South Dakota Codified Law § 37-24-1 *et seq*; and (n) violated Nevada Rev. Stat. § 41.600(1).

21.    Accordingly, Plaintiffs, on behalf of themselves and the estimated hundreds of thousands of similarly situated persons who purchased and consumed Huel Black, seek to hold Defendant responsible for the injuries they suffered as the result of Huel's misconduct and failure to act, and demand appropriate monetary, equitable, injunctive, and declaratory relief.

---

[14] Pursuant to the notice requirements under New York and California law, Plaintiffs are providing notice to Defendant of their breach of implied and express warranty claims and, as to the California subclass, their claim under the CLRA contemporaneously herewith and anticipates will assert such claims, as appropriate and if uncured, when the notice period has expired.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because this is a class action where the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 putative members in the proposed Class and subclasses, and at least one Class Member is a citizen of a state different from any Defendant.

23.     This Court has personal jurisdiction over Defendant because Defendant is headquartered in this District and a substantial portion of the acts complained of took place in this District.

24.     Venue also is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant is headquartered in this District and a substantial portion of the acts complained of took place in this District.

## PARTIES

### A.     PLAINTIFFS

25.     Each Plaintiff and each Class Member has suffered a concrete and particularized injury, including, but not limited to, loss of the benefit of the bargain and diminished value of their product, as a result of Defendant's concealment of lead and cadmium in Huel Black, which Plaintiffs and Class members purchased.  It is highly likely that the Huel Black purchased by each and every Plaintiff and each Class Member contained unhealthy levels of lead and cadmium. Any reasonable consumer would expect that the Huel Black they purchased would be safe and free from harmful and undisclosed lead and cadmium.

26.     Plaintiff Ben Tal ("Tal") is, and at all relevant times was, a resident of New York. Tal purchased for his personal use and consumed multiple flavors of Huel Black from May 2022 through November 2023.  Tal would not have purchased Huel Black had he known that the product

contained lead and cadmium, but would consider purchasing Huel Black in the future if lead and cadmium are removed.

27.    Plaintiff Liam Traynor ("Traynor") is, and at all relevant times was, a resident of Florida. Traynor began buying Huel Black Edition in or about November 2020 for his personal use and continued to purchase and consume Huel Black through in or around September 2025. Traynor would not have purchased Huel Black had he known that the product contained lead and cadmium, but would consider purchasing Huel Black in the future if lead and cadmium are removed.

28.    Plaintiff Jordan Ancel ("Ancel") is, and at all relevant times was, a resident of California.  Ancel began ordering Huel Black on or about August 1, 2022 for personal use, and last purchased Huel Black on July 8, 2025.  Ancel would not have purchased Huel Black had he known that the product contained lead and cadmium, and he will no longer use his remaining supply, but would consider purchasing Huel Black in the future if lead and cadmium are removed.

29.    Plaintiff David Rosen ("Rosen") is, and at all relevant times was, a resident of Florida. Rosen purchased for personal use and began using Huel Black in February 2022, continued to purchase Huel Black through July 2025, and continued to consume Huel Black until he became aware of the existence of lead and cadmium in the product.  Rosen would not have purchased Huel Black had he known that the product contained lead and cadmium, but would consider purchasing Huel Black in the future if lead is removed.  Through his subscription, Rosen has compiled multiple bags of the product which he is unable to consume in light of the presence of lead and cadmium.

30.    Plaintiff Nicholas Tinkle ("Tinkle") is, and at all relevant times was, a resident of New York. Tinkle purchased Huel Black for personal use in March 2024.  Tinkle would not have

purchased Huel Black had he known that the product contained lead and cadmium, but would consider purchasing Huel Black in the future if lead and cadmium are removed.

31.     Plaintiff Amadeo Baltazar ("Baltazar") is, and at all relevant times was, a resident of New York. Baltazar began purchasing Huel Black for personal use approximately two years ago through a subscription with Huel. Baltazar would not have purchased Huel Black had he known that the product contained lead and cadmium, but would consider purchasing Huel Black in the future if lead and cadmium are removed.

32.     Plaintiff David Raymond ("Raymond") purchased two bags of Huel Black for personal use in June 2023. Raymond is a resident of Illinois, but resided in California at the time of purchase.  Raymond would not have purchased Huel Black had he known that the product contained lead and cadmium.

33.     Plaintiff Jeffrey Lin ("Lin") is, and at all relevant times was, a resident of California. Lin purchased two bags of Huel Black for personal use in or about 2023.  Lin would not have purchased Huel Black had he known that the product contained lead and cadmium, but would consider purchasing Huel Black in the future if lead and cadmium are removed.

34.     Plaintiff Jon Latane ("Latane") is, and at all relevant times was, a resident of North Carolina.  Latane purchased Huel Black in January and February 2022 for his personal use. Latane would not have purchased Huel Black had he known that Huel Black contains lead and cadmium.

35.     Plaintiff Timothy Kaiser ("Kaiser") is, and at all relevant times was, a resident of South Dakota.  Kaiser purchased Huel Black in August 2025 for his personal use, and continued to consume the product until he recently became aware of the existence of lead and cadmium in the product.  Kaiser would not have purchased Huel Black had he known that the product contained

lead and cadmium, but would consider purchasing the product in the future if lead and cadmium are removed.

36.    Plaintiff Joseph Hsu ("Hsu") purchased two bags of Huel Black through subscription on May 12, 2021, and two more bags of Huel Black on January 5, 2022 for his personal use.  Hsu is a resident of Michigan, but resided in Nevada at the time of purchase.  Hsu would not have purchased Huel Black had he known that the product contained lead and cadmium, but would consider purchasing the product in the future if lead and cadmium are removed.

37.    Plaintiff Victor Torres-Velez ("Torres-Velez") is, and at all relevant times was, a resident of New Jersey.  Torres-Velez first purchased Huel Black for personal use approximately one year ago.  Through a product subscription with Huel, Torres-Velez continued to purchase and consume Huel Black until he recently became aware of the existence of lead and cadmium in the product.  Torres-Velez would not have purchased Huel Black had he known that the product contained lead and cadmium, but would consider purchasing the product in the future if lead and cadmium are removed.  Through his subscription, Torres-Velez has compiled multiple bags of the product which he is unable to consume due to the presence of lead and cadmium.

## B.    DEFENDANT

38.    Defendant Huel Inc. is a Delaware corporation, with its offices located at 45 Main Street, Suite 604, Brooklyn, New York 11201.

39.    Defendant manufacturers, designs, distributes, supplies, markets, promotes, advertises, and sells Huel Black directly on its web site, including by subscription, and in retail stores and through online retailers, like Amazon.

40.     Huel's U.S. headquarters in Brooklyn, New York are home to its USA Customer Experience, Logistics, Supply Chain, Technical, Retail, and Marketing teams and is the location from which it manages all of its U.S. operations.

- The Customer Experience team provides support to customers in the United States;

- The Logistics and Supply Chain team works on manufacturing and shipping Huel's products, managing the flow of ingredients to keep the U.S. market stocked, and working with manufacturers and partners to ensure efficiency;

- The Technical and Marketing teams manage technical operations and marketing efforts specifically for the U.S. market; and

- The Retail Sales team manages Huel's brand presence in retail stores across the U.S.

41.     Each of these functions performed in Brooklyn, New York are integrally related and central to the allegations in this action.

## FACTUAL ALLEGATIONS

42.    Defendant's Huel Black products contain unhealthy and potentially unsafe levels of lead and cadmium.

### A.    LEAD AND ASSOCIATED HEALTH RISKS

43.    There is no health benefit to the inclusion of lead in food products.

44.    To the contrary, lead is a highly toxic heavy metal, used in the production of batteries, ammunition, and metal products such as solder and pipes.  Lead is an element, which means it does not break down.

45.    Lead is universally identified as a probable human carcinogen by health agencies in the United States and worldwide. For example:

- The U.S. Department of Health and Human Services ("HHS") determined that lead was "reasonably anticipated to be a human carcinogen."

- The U.S. Environmental Protection Agency ("EPA") classifies lead as a "probable human carcinogen."

- The International Agency for Research on Cancer ("IARC") classifies lead as "probably carcinogenic to humans."

46.    Lead is number two on the Agency for Toxic Substances and Disease Registry's ("ASTDR") list of substances present in the environment that poses the most significant potential threat to human health.[15]  No amount of lead is safe for human consumption or exposure.[16]

---

[15] https://www.atsdr.cdc.gov/programs/substance-priority-list.html.

[16] *See, e.g., Lead in Food and Foodwares*, U.S. Food & Drug Administration, https://www.fda.gov/food/environmental-contaminants-food/lead-food-and-foodwares    (last visited Oct. 16, 2025) ("Because there is no known safe level of exposure to lead, the FDA monitors and regulates levels of lead in foods."); *Lead poisoning*, World Health Organization ("WHO"),    https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health    (last visited Oct. 16, 2025) ("There is no level of exposure to lead that is known to be without harmful effects.").

47.    The World Health Organization ("WHO") identifies lead as one of ten chemicals of major public health concern requiring action.[17]

48.    Once lead enters the body, it is distributed to organs, including the brain, kidneys, and liver, and it accumulates and is stored in teeth and bones.[18]  Because lead can accumulate in the body, even very low-level exposure can be hazardous over time.

49.    Lead can cause health problems in almost every organ and system in your body.  As examples, exposure to lead can cause damage to the kidneys, anemia (low iron in the blood), and increases in blood pressure.  Long-term exposure to lead can also result in cognitive deficits, such as decreased learning, memory, and attention.  Exposure to high lead levels can severely damage the brain and kidneys, damage male reproductive organs, and cause death.[19]

50.    Lead is particularly dangerous to the health and well-being of small children and early childhood exposure to lead is known to cause behavioral health problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth, as well as severe neurological effects.  Lead exposure in children is linked to learning disabilities, behavioral difficulties, and lowered IQ.  Additionally, lead exposure in early childhood is proven to have a strong inverse relationship with test scores, as well as lower reading and math scores in third-grade children.

51.    Ingestion of large amounts of lead can cause children to develop anemia, severe stomachache, muscle weakness, and brain damage.[20]

---

[17] WHO, *Lead poisoning*.

[18] WHO, *Lead poisoning*.

[19] ATSDR, *Lead – ToxFAQs*.

[20] *Id.*

52.     There are also health risks that make pregnant individuals, individuals planning to become pregnant, and breastfeeding parents more vulnerable to lead exposure. According to the EPA, "[l]ead can accumulate in our bodies over time, where it is stored in bones along with calcium.  During pregnancy, lead is released from the mother's bones along with calcium and can pass from the mother exposing the fetus or the breastfeeding infant to lead."  This could result in serious health effects, including putting the parent at risk for miscarriage, causing the baby to be born early or too small, increasing likelihood of learning or behavioral problems, and damaging the baby's brain, kidneys, and nervous system.[21]

53.     Because of health concerns associated with human exposure to lead, beginning nearly 30 years ago, the use of lead in paints, ceramic products, caulking, and pipe solder has been dramatically reduced, and the use of lead as an additive to automobile gasoline was banned in the United States.[22]

54.     While lead levels in protein powders are not regulated, approved, reviewed, or tested by United States regulatory bodies, lead ingestion by humans has long been subject to regulatory scrutiny.  Indeed, the U.S. Food and Drug Administration ("FDA") has set a 5 parts per billion ("ppb") lead standard for bottled water, WHO has set 10 ppb lead as a provisional guideline for drinking water, and EPA has set an action level of 15 ppb for lead in drinking water. FDA has also issued non-binding guidance for lead in certain juices (50 ppb) and candy (100 ppb).  The EU has set the maximum lead level in infant formula to 20 ppb.

---

[21]     *Learn about lead*, United States Environmental Protection Agency, https://www.epa.gov/lead/learn-about-lead (last visited October 17, 2025).

[22]     Agency for Toxic Substances and Disease Registry ("ATSDR"), Division of Toxicology and Human Health Services, *Lead – ToxFAQs*, *available at* https://www.atsdr.cdc.gov/toxfaqs/tfacts13.pdf.

55.     There is a growing consensus among health experts that lead levels in food and drinks consumed by children should not exceed 1 ppb: The American Academy for Pediatrics, the Environmental Defense Fund, and *Consumer Reports* have all called for this limitation.

56.     According to the EPA, the most important step to take is to prevent lead exposure before it occurs.[23]

### B.     CADMIUM AND ASSOCIATED HEALTH RISKS

57.     Cadmium has no known beneficial function in the human body.[24]

58.     Cadmium is number seven on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health.

59.     Chronic exposure to cadmium can lead to serious long-term effects including kidney and bone disease, along with an increased risk of cancers, such as breast, lung, prostate, nasopharynx, pancreas, and kidney cancers.  Several health agencies classify cadmium as a known human carcinogen, including the IARC, WHO, and HHS.

60.     Cadmium is also suspected to be mutagenic, meaning it can cause genetic mutation and can inhibit DNA repair and induce DNA strand breaks and chromosomal aberrations.[25]

61.     Cadmium is particularly harmful to children and exposure in childhood is associated with decreases in cognitive ability, as well as the development of attention deficit

---

[23] EPA, *Learn about lead.*

[24] ATSDR, *What Is the Biological Fate of Cadmium in the Body?*, https://archive.cdc.gov/www_atsdr_cdc_gov/csem/cadmium/Biological-Fate.html#:~:text=It%20gradually%20increases%20with%20age,be%20regarded%20as%20pote ntially%20toxic (last visited November 20, 2025).

[25] *See, e.g., Cadmium is a mutagen that acts by inhibiting mismatch repair*, National Library of Medicine,                                          available                                          at: https://pmc.ncbi.nlm.nih.gov/articles/PMC2662193/#:~:text=Cadmium%20is%20a%20mutagen %20that%20acts%20by%20inhibiting%20mismatch%20repair.

hyperactivity disorder ("ADHD").  A 2018 study linked cadmium exposure to ADHD, finding that the disorder was more common among children with the highest levels of cadmium exposure as compared to a control group.

62.    Cadmium appears to affect cognitive development of children, particularly of boys, with studies showing that boys exhibiting higher amounts of cadmium exposure had seven fewer IQ points than those exhibiting less cadmium exposure.

63.    Cadmium exposure is also particularly harmful during pregnancy and is associated with reproductive toxicity.  Human and animal epidemiological studies have shown cadmium exposure in pregnancy to be associated with significant reduction in birthweight and increased occurrence of stillbirth.[26]

64.    Like lead, cadmium accumulates in the body with a long half-life of 6 to 38 years in the kidneys and 4 to 19 years in the liver.[27]

65.    WHO's guideline for cadmium concentrations in drinking water is 3 micrograms per liter or less.[28]

**C.    DEFENDANT'S CONTAMINATED PRODUCT**

66.    Consumers like Plaintiffs and Class Members rely heavily on Defendant to supply safe, nutritious meal replacement shakes and to provide accurate and complete information about the contents of the Huel Black products they sell.

---

[26] *Evidence on Developmental and Reproductive Toxicity of Cadmium*, California Environmental Protection Agency, available at: https://oehha.ca.gov/sites/default/files/media/downloads/proposition-65/chemicals/cd-hid.pdf

[27] ATSDR, *What Is the Biological Fate of Cadmium in the Body?*

[28] *Preventing Disease Through Healthy Environments*, WHO, available at: https://iris.who.int/server/api/core/bitstreams/f190f2f1-f74d-48a3-823b-25f5d3af702b/content.

67.     Protein powders like Huel Black are not occasional indulgences; they are a regular part of consumers' daily routines. Indeed, Huel encourages its consumers to use Huel Black to replace multiple meals per day (even conducting and publicizing a Huel-sanctioned study in which four individuals consumed *only* Huel and water for a period of five weeks).

68.     Unknown to Plaintiffs and Class Members, Defendant has been marketing, distributing, and selling Huel Black products, intended for consumption as a meal replacement multiple times per day, that are tainted with significant, elevated concentrations of toxic lead and cadmium.

### D.     THE REPORT

69.     Consumer Reports is an American nonprofit consumer organization dedicated to independent product testing, investigative journalism, consumer-oriented research, public education, and consumer advocacy.[29]

70.     On October 14, 2025, Consumer Reports published a report titled "Protein Powders and Shakes Contain High Levels of Lead" that set forth the results of Consumer Reports' testing of 23 protein powder products for presence of heavy metals.  Many of the products tested caused concern for Consumer Reports, but only two had levels of lead so high that Consumer Reports recommended that they not be consumed at all.  Huel Black was one of those products.

71.     Indeed, Consumer Reports' lead testing results were so alarming that the Report describes Huel Black as a "Product[] to Avoid," recommending that consumers should observe a "0 servings per week limit."

---

[29] https://en.wikipedia.org/wiki/Consumer_Reports (last visited October 20, 2025).



72.     In introducing Consumer Reports' test results, the Report described the significant

health risks for any human consumption of lead, explaining:

> While no amount of lead is technically safe, the greatest danger
> comes from repeated or continued exposure, particularly at high
> doses, says Rose Goldman, MD, an associate professor of medicine
> and physician at Cambridge Health Alliance in Medford, Mass.
> Children and pregnant people are most vulnerable because lead can
> damage the developing brain and nervous system, which has the
> potential to cause neurological issues, learning delays, and
> behavioral problems. But chronic lead exposure has also been linked
> to immune suppression, reproductive problems, kidney damage, and
> high blood pressure in adults.

73.     To conduct its testing, Consumer Reports

> purchased multiple samples of each product, including two to four
> distinct lots, over a three-month period beginning [November 2024].
> CR bought the products anonymously from a variety of sources,
> including popular online retailers like Amazon and Walmart, and at
> supermarkets and health food stores in New York state, such as the
> Vitamin Shoppe and Whole Foods Market. Then CR tested samples
> from multiple lots of each product for total protein, arsenic,
> cadmium, lead, and other elements.

74.     To conduct its study, Consumer Reports analyzed two to three unique samples of

the 23 products they tested, which were blind coded and sent to an independent, accredited

laboratory for testing in accordance with the Association of Official Analytical Chemists

("AOAC") Method 2015.01.  According to Consumer Reports, the "testing conformed to the quality control criteria and performance requirements set in cited official methods, as well as those in ISO 17025."

75.     Consumer Reports' "level of concern for lead" was 0.5 micrograms per day, which is also the Maximum Allowable Dose Level ("MADL") established through California's Proposition 65 laws and regulations ("Prop 65").

76.     This testing confirmed that the samples of Huel Black Edition, Chocolate contained 6.31 micrograms of lead, or 70.2 ppb, in a single serving—12.62 times Consumer Reports' level of concern and over seven times the concentration of lead permissible in bottled water products.

77.     The Consumer Reports study also revealed Huel Black had troubling cadmium levels in each serving at 9.2 micrograms—more than double the level that public health authorities and Consumer Reports' experts said may be harmful to have daily—4.1 micrograms, which is also the MADL for reproductive toxicity—and more than triple the limit recommended by WHO for a liter of drinking water—3 micrograms.

78.     Huel's recommended chronic use of Huel Black exacerbates the negative potential health effects of Huel Black's lead and cadmium contaminations given the known cumulative effect of exposure to these heavy metals within the human body.

79.     Lead and cadmium presence in almost all other products tested by Consumer Reports was significantly lower than Huel Black (with many well below reported concern levels); with no detectable lead or cadmium at all found in Huel competitor MuscleTech's 100% Mass Gainer Vanilla Milkshake product.

80.     *The New York Times'* independent experts were troubled by the revelations within the Report.  For example, Dr. Stephen Luby, a professor of medicine at Stanford University, stated

that the results were "very troubling," and he "was 'appalled' that companies hadn't monitored their supply chains well enough to avoid the levels that the testing found." Dr. Luby further stated: "We should be asking ourselves, is this exposure to protein powder creating more risks than it is benefits?"[30]

81.     The Report's findings are particularly concerning to children and pregnant women. For example, per *The New York Times*, Dr. Jenna Forsythe, the director of Project Unleaded at Stanford University, a research program working to reduce lead poisoning, noted her particular concerns for pregnant women in response to the lead contents, "given that they are often advised to increase their protein consumption during pregnancy." Consequently, Dr. Forsythe said pregnant women or women trying to become pregnant should avoid the products flagged in the Report as having the highest levels of lead, and even "people in lower-risk groups should probably not have them every day and should seek out other options if possible."[31]

82.     As also noted in *The New York Times*, Defendant did not deny the existence of lead in Huel Black; rather, Defendant commented that the lead content did not exceed certain levels and is safe. The head of nutrition at Defendant Huel "wrote in an email that the lead content was 'well within internationally recognized safety limits' and that the company's products were 'completely safe.'"[32]

83.     Only after the Report was publicized did Huel address the presence of heavy metals in its products. Although not immediately apparent on or easily navigable from its website, a

---

[30] Maggie Astor, *Lead Found in Popular Protein Powders and Shakes, Report Says*, THE NEW YORK TIMES, Oct. 14, 2025, *available at* https://www.nytimes.com/2025/10/14/well/lead-protein-powder.html.

[31] *Id.*

[32] *Id.*

consumer who searches for "Huel" and "lead" or "heavy metals" will find Huel's web page titled "Heavy Metals in Huel – What You Need to Know."  It appears this web page was written in direct response to and references the Report.

84.    Huel's heavy metals page does not address its misrepresentations and omissions. Instead, it doubles down on its representations about safety, compliance with the strictest regulations, and downplays the safety and health risks posed by consumption of Huel's products. Huel's page tell consumers: "Here's what the science says about lead levels in Huel, how we test every batch, and why the **data shows our products are safe** and compliant with FDA and EU standards." (emphasis added).  This representation was also misleading as Huel does not disclose that neither the FDA nor the EU regulate or set standards for the presence of heavy metals in protein powders.  Deflecting from the fact that lead at any level, and particularly at the levels in Huel Black products, is harmful to humans, Huel states: "We're talking about **amounts so small that they're measured in parts per billion, or millionths of a gram**." (emphasis in original).

85.    From its new heavy metals page, Huel links to test results from a product test it commissioned in February 2025 from the National Sanitation Foundation, which only showed that the sample contained lead concentrations of less 3.6 micrograms per serving—lead concentrations at that level could still be more than 7 times the 0.5 micrograms level Consumer Reports and Prop 65 set as concern levels in food. By providing these misleading test results, Huel has further has concealed the presence of lead and cadmium in its Huel Black products.  In any event, the presence of lead and cadmium in Huel Black, at any concentration, was never disclosed to the consumer.

86.    Huel still has not changed any of its recommendations for its products usage, particular for pregnant women and children, despite its admitted knowledge of the Report's finding.

**E.    THE PRESENCE OF LEAD AND CADMIUM IN HUEL BLACK IS MATERIAL TO CONSUMERS**

87.    According to a report authored by Allied Market Research, the global vegan protein powder industry was valued at $3.5 billion in 2021 and is projected to reach $7.3 billion by 2031.[33] Huel has a significant market share of that industry with its 2024 annual revenue topping £200 million.

88.    In recent years, there has been burgeoning consumer demand for different types of vegan food products from health-conscious target consumers. This rising consumer awareness regarding the health benefits of vegan protein over animal protein is boosting the growth of the vegan protein powder market.[34]

89.    Health-conscious consumers are mainly responsible for driving demand for plant-based protein, including protein powder.  Other factors driving demand are consumers seeking to reduce their impact on animals and the environment and customers with dairy allergies and intolerances.[35]

90.    Plaintiffs and Class Members who purchased plant-based Huel Black reasonably believe they are purchasing a premium and healthy protein-based meal replacement or supplement

---

[33] Vegan Protein Powder Market Size, Share, Competitive Landscape and Trend Analysis Report, by Nature (Organic, Conventional), by Product Type (Soy, Spirulina, Pumpkin, Pea, Rice, Hemp, Others), by Age Group (Millennials, Generation X, Baby Boomers), by Packaging Type (Jar, Box, Bucket, Bags/Pouch, Others), by Distribution Channel (Modern Trade, E-commerce, Others): Global Opportunity Analysis and Industry Forecast, 2021 – 2031, Allied Market Research (Oct. 2022), *available at*: https://www.alliedmarketresearch.com/vegan-protein-powder-market-A16896.

[34] *Id.*

[35] *Health Conscious Consumers and Significant Innovation Fuels Vegan Protein Powder Sales*, Plant Based World Pulse (May 19, 2023), https://plantbasedworldpulse.com/health-conscious-consumers-and-significant-innovation-fuels-vegan-protein-powder-sales/ (last visited October 16, 2025).

that has been rigorously tested for nutrition, quality, and safety, including testing for the presence of heavy metals, that is free of dangerous levels of carcinogenic, toxic, mutagenic, and genotoxic lead and cadmium.

91.    Health-conscious consumers of plant-based Huel Black, such as Plaintiffs and Class Members, reasonably relied and rely on Defendant's representations that its product is rigorously tested for heavy metals, nutritionally complete, a healthy meal replacement, and safe for pregnant individuals and children.

### F.    Defendant's Unfair and Misleading Marketing and Advertising of Huel Black

92.    Huel Black products contain significant, unsafe, and unhealthy levels of lead and cadmium that significantly exceed levels of these heavy metals in competitor vegan protein powder products.  Defendant's advertising and marketing leads consumers to believe the opposite.

93.    Huel's misleading advertising with regard to heavy metal contamination of its Huel Black product is unsurprising.  Huel has repeatedly come under fire by U.K. regulators for publishing false, misleading, and unsubstantiated advertisements, including as to health-related claims.[36]

94.    Huel states that its mission is "[t]o make nutritionally complete, convenient, affordable food, with minimal impact on animals and the environment."[37]

95.    Huel describes itself as "plant-based nutrition to help the planet thrive" and states on its website "[w]e are here to change the way people think about food," explaining: "In short,

---

[36]    *See, e.g.,*    https://www.just-food.com/news/huel-zoe-misleading-adverts-banned-by-uk-advertising-body/;    https://www.just-food.com/news/huel-ads-banned-by-asa-for-misleading-claims/.

[37]    Huel, https://huel.com/pages/about-us (last visited Oct. 20, 2025).

we need food that prioritizes nutrition, does not generate lots of waste, and has minimal environmental impact."[38]

96.     As depicted below in regard to Huel Black, Defendant Huel stresses on its website that the product is a meal, not a protein shake.



97.     Huel states that its Black Edition product is "100% nutritionally complete," has "161 science-backed health benefits," and contains "all the nutrients you need to thrive."



---

[38] *Id.*

98.     Huel's social media pages similarly tout Huel's purportedly health-positive benefits.



99.     But Huel's advertisements concerning the health, safety, and benefits of its Huel Black products are false and misleading and omit material information.

100.    Huel never discloses on its website[39] or in advertisements that Huel Black contains harmful heavy metals.  Defendant also does not disclose on its product packaging that Huel Black contains lead and cadmium.

101.    Neither Defendant's labeling nor the "Nutritional Facts" it provides with its products warns consumers that lead and cadmium is or may be contained therein.  For example,

---

[39] Only after the Report did Huel add an all but hidden section to its website acknowledging the Report's findings and disputing that the lead the Report found in Huel Black is dangerous.

depicted below is a screenshot of the Black Edition chocolate flavor labeling available on Huel's website, which does not disclose the presence or possible presence of lead and cadmium.



102.    Instead, Huel markets the health benefits of its product.  Huel represents that its Huel Black product improves "cognitive function," but does not disclose that the potentially unsafe levels of lead and cadmium they contain have significant negative cognitive health effects—especially if used consistent with Huel's recommendation—as a meal replacement once or twice a day, every day.

 **deka31473** I was wondering if drinking 2 ready made black edition shakes a day is 2 much. Would just 1 be better

37w  Reply

 **huel** ✓ Two isn't too much, but it really comes down to how Huel works best for you. Many of our customers have Huel 1-2 times a day then make up the rest of their daily food intake with more traditional options.

37w  Reply

———  Hide replies

103.    Huel markets Huel Black as "Formulated with naturally beneficial superfoods" and "[c]rafted using the finest ingredients in nature, we meticulously choose only the highest quality sources, never settling for anything less," but as the Report indicates, competitor protein powders have significantly higher quality sources, because their protein powder products contain significantly less, or in some cases, no, lead and cadmium.

104.    On Huel's "health benefits" web page, Huel lists the 160 different vitamins, minerals, and nutrients its products contain, but does not disclose that its Huel Black, products contain cadmium and lead and does not disclose the negative health effects of their inclusion.

105.    Huel misleads consumers about the safety and quality of its products by touting its "rigorous testing" and states that it holds itself and its suppliers to the "highest quality standards."[40] For example, on its website it represents:

> Grown by nature, perfected by science, Huel blends nutrient-rich ingredients like oats, brown rise, coconut, and peas with added vitamins and minerals for **maximum health** and taste. **Our Milton Keynes facility and global partners uphold the highest standards, with rigorous ingredient testing** ensuring consistent quality, flavor, and nutrition in every meal.

---

[40] *Id.*

This assertion is at best misleading.  The lead and cadmium in Huel Black causes negative health effects and if its manufacturing facilities were "upholding the highest standards, with rigorous ingredient testing," their Huel Black products would have significantly less or no lead or cadmium in its products, like most other protein products tested by Consumer Reports.

106.     In other marketing, Huel states that it is "passionate about high-product quality," and that its products meet the "highest safety standards and regulations," explaining:

> All Huel products are developed by a team of experienced Nutritionists and Product Development Specialists.  They are produced using the best ingredients in facilities that meet the strictest quality standards.  All our facilities and equipment are held to the highest safety standards and regulations, so you can be sure you'll be consuming top-quality nutrition. [41]

107.     It continues that its "Huelway Code" requires "rigorous testing [of its powdered protein products] to ensure every product meets our strict requirements" and that per its finished product testing policy, "[a]ll Huel products are routinely tested for micro, allergens, heavy metals, and pesticides. We have sampling teams in the UK and US, using certified labs UKAS and FDA-compliant standards. Our in-house NIR tech also enables advanced quality testing when needed."[42]

108.     Huel also represents that "[e]very year, we invest over $1 million in product testing using a range of independent ISO 17025 accredited laboratories covering every stage of production from raw materials and finished products," and that the "results for lead, cadmium, arsenic , and mercury have been consistent:  **safe, stable, and well within global standards**" (emphasis in original).

109.     All of these statements are false or misleading, because, as Huel admits elsewhere, California's Prop 65 sets the highest safety standards for heavy metal contamination in foods, and

---

[41] *Id.*

[42] https://huel.com/pages/quality-standards.

it's so called "rigorous testing" does not even test for heavy metals at a level that would detect whether Huel products are meeting those standards.

110.    In fact, the testing they purport to regularly conduct is not designed to test for unsafe levels of heavy metals. Based on an NSF report from February 2025 published on Huel's website in response to the Report, the heavy metals testing they conduct reports as "non-detectible" any lead contamination under 3.6 micrograms. But 3.6 micrograms is more than seven times the harm threshold for oral ingestion set by multiple regulators and Consumer Reports and, at 40 ppb, four times the concentration of lead contamination regulators find acceptable in drinks like bottled water.

111.    On its Quality and Testing web page, Huel states that "at each step of the process, we go above and beyond industry standards," notwithstanding that of the 23 protein powder products tested by Consumer Reports, only *one* had higher concentrations of lead and *none* had higher concentrations of cadmium.

112.    Huel also says its products are safe for children and pregnant women, two particularly at-risk groups.

113.    Huel's FAQs state: "Huel is safe for children above 4 years of age to include in moderation as part of a balanced, varied diet, but please give our Children, Adolescents and Huel guide a read." This guide says 4 to 8-year-old children should consume half a serving because "This will provide 200 calories, and 10g of protein, which is comparable to pediatric nutrition supplements, and could be useful to support your child's nutritional intake." The guide advises that 9 to 13-year-old children can have one full serving per day as "This will provide 400 calories, and 20-35g of protein, depending on the product. These can be enjoyed according to the directions on the label, or blended with frozen fruit to make a nutrient-dense fruit smoothie." And

as to 14 to 18-year-old children: "Older adolescents have, in most cases, nutritional requirements greater than those of adults due to the fact that they're growing, they're often physically active and are studying at school or college. Generally speaking, this age group can enjoy any of our meals or protein products as part of a balanced, varied diet."

114.    In fact, Huel Black products are not suitable for children due to their heavy metal contamination, and nowhere does Huel warn that its product contains heavy metals that are particularly harmful to developing children in these age groups.

115.    Huel's FAQs also advise pregnant women its products can be used daily with the only caveat that consuming too much of the products could result in these women, who are often taking prenatal vitamins, to be ingesting too much vitamins—never warning women would be ingesting too much lead and cadmium:

> Most Huel products are fine to have during pregnancy, but our meal, protein powder, and bar products should be limited to one serving per day as there are different nutritional requirements during this period. This is because Huel is rich in vitamins and minerals, so sticking to one serving can help to avoid excess vitamin and mineral intake.

116.    In its social media advertisements, Huel specifically advises consumers that Huel powders are "a great option for you in your pregnancy," and that powders such as Huel Black are "suitable for pregnant people at one serving per day."[43]  Huel does not disclose that the lead and cadmium contaminating its Huel Black products are particularly harmful to pregnant individuals.

---

[43]    https://www.instagram.com/reel/CwnW28dtW1Q/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA==.

### G.   DEFENDANT CONTROLS THE MANUFACTURING AND QUALITY CONTROL PROCESS

117.    Defendant is responsible for selecting and sourcing the ingredients used in manufacturing Huel Black and for conducting all relevant quality assurance testing. In fact, Defendant admits: "Yes. Every Huel product is tested by independent, accredited labs in the UK and U.S. for lead, cadmium, arsenic, and mercury."  Despite its knowledge that Huel Black contains lead and cadmium, Defendant has chosen to conceal the true quality, nature, and safety of Huel Black by not disclosing this toxic constituent.

118.    Defendant utilizes consistent manufacturing and production processes purportedly "viewed as the gold-standard process" to ensure its Huel Black products are of consistent quality across production runs.  To achieve this, Defendant uses standardized manufacturing and production protocols designed to minimize variation in the production process.  These protocols include strict quality control measures, standardized sourcing of ingredients, and testing procedures to ensure the final product meets the manufacturer's quality standards.

119.    These standardized measures ensure consistency in Defendant's products and ensure that Defendant understands all constituents of its final products, including its Huel Black products.

120.    Because of heightened public awareness of the existence of lead in consumer products and the resulting health risks, for many years, Defendant knew it needed to ensure that the raw materials and ingredients used in its manufacturing process were not contaminated with lead.  In fact, it admits it did test for these elements, but simply chose to test only at levels multiples of the strictest safety standards and to not to share its testing information with consumers (until they shared one test of one product in October 2025).

121.    Defendant knew that Huel Black products were contaminated with lead and cadmium at the point of sale.

122.    At all relevant times, Defendant concealed and never disclosed that the Huel Black products were contaminated with lead and cadmium at dangerously high levels.  To date, Defendant has not disclosed that lead and cadmium are present in its Huel Black labeling and have not re-configured Huel Black to be lead and cadmium free.  This information was not available to Plaintiffs, Class Members, or the public.

### H.    PLAINTIFFS WERE MISLED AND INJURED BY DEFENDANT'S MISCONDUCT

123.    Defendant's Huel Black products are promoted as premium, safe, rigorously tested, healthy, everyday meal replacements and supplements that support weight loss, fitness, and busy schedules and improve cognitive function.

124.    Based on Defendant's representations and omissions with respect to Huel Black, Plaintiffs and other Class Members reasonably believed they were purchasing a premium, safe, rigorously tested, healthy, everyday protein-based meal replacement or supplement.

125.    As detailed above, these representations and omissions were, at best, misleading, given the serious adverse health effects that are attributable to lead and cadmium ingestion that cannot be reversed or remediated due to its accumulation in the body over time.

126.    Thus, Plaintiffs and other consumers of Huel Black would not have purchased and/or would have paid significantly less for Huel Black had they known that the Huel Black contained lead and cadmium.

## CLASS ACTION ALLEGATIONS

127.    Plaintiffs bring this action individually and as a representative of all of those similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

128.    Plaintiffs seek to a nationwide Class defined as follows:

> During the fullest period allowed by law, all persons who purchased Huel Black in the United States within the applicable statute of limitations for personal or household use and not resale, until the date notice is disseminated.

129.    Plaintiffs Tal, Tinkle, and Baltazar seek to represent a proposed subclass ("New York Subclass") defined as follows:

> During the fullest period allowed by law, all persons who resided in New York and purchased Huel Black within the applicable statute of limitations for personal or household use and not resale, until the date notice is disseminated.

130.    Plaintiffs Ancel, Raymond, and Lin seek to represent a proposed subclass ("California Subclass") defined as follows:

> During the fullest period allowed by law, all persons who resided in California and purchased Huel Black within the applicable statute of limitations for personal or household use and not resale, until the date notice is disseminated.

131.    Plaintiffs Rosen and Traynor seeks to represent a proposed subclass ("Florida Subclass") defined as follows:

> During the fullest period allowed by law, all persons who resided in Florida and purchased Huel Black within the applicable statute of limitations for personal or household use and not resale, until the date notice is disseminated.

132.    Plaintiff Latane seeks to represent a proposed subclass ("North Carolina Subclass") defined as follows:

> During the fullest period allowed by law, all persons who resided in North Carolina and purchased Huel Black within the applicable statute of limitations for personal or household use and not resale, until the date notice is disseminated.

133.    Plaintiff Kaiser seeks to represent a proposed subclass ("South Dakota Subclass") defined as follows:

> During the fullest period allowed by law, all persons who resided in South Dakota and purchased Huel Black within the applicable statute of limitations for personal or household use and not resale, until the date notice is disseminated.

134.    Plaintiff Torres-Velez seeks to represent a proposed subclass ("New Jersey Subclass") defined as follows:

> During the fullest period allowed by law, all persons who resided in New Jersey and purchased Huel Black within the applicable statute of limitations for personal or household use and not resale, until the date notice is disseminated.

135.    Plaintiff Hsu seeks to represent a proposed subclass ("Nevada Subclass") defined as follows:

> During the fullest period allowed by law, all persons who resided in Nevada and purchased Huel Black within the applicable statute of limitations for personal or household use and not resale, until the date notice is disseminated.

136.    The Nationwide Class, New York Subclass, California Subclass, Florida Subclass, North Carolina Subclass, South Dakota Subclass, New Jersey Subclass and Nevada Subclass are referred to collectively as the "Class" or "Classes," and the members of the Classes are referred to as the "Class Members."  Specifically excluded from the Classes are: (1) Defendant, any entity in which a Defendant has a controlling interest or has a controlling interest in Defendant, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel. Plaintiffs reserve the right to amend the class definitions as necessary.

137.    ***Numerosity***: The Members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class Members is presently unknown, given the wide distribution of Huel Black, it is voluminous and nationwide.  The number of Class Members can be determined by sales information and other records.  Moreover, joinder of all potential Class Members is not practicable given their numbers and geographic diversity.  The Class is readily identifiable from information and records in the possession of Defendant and its authorized retailers.

138.    *Typicality***:** The claims of the representative Plaintiffs are typical in that Plaintiffs, like all Class Members, purchased Huel Black containing lead that were manufactured, marketed, advertised, distributed, and sold by Defendant.  Plaintiffs, like all Class Members, have been damaged by Defendant's misconduct in that, *inter alia*, they have incurred or will continue to incur damages as a result of overpaying for Huel Black containing a harmful ingredient which makes Huel Black not what reasonable consumers intended to purchase. Furthermore, the factual basis of Defendant's misconduct is common to all Class Members because Defendant has engaged in systematic fraudulent behavior that was deliberate, includes negligent misconduct, and results in the same injury to all Class Members.

139.    *Commonality***:** Common questions of law and fact exist as to all Members of the Class.  These questions predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class. Such common legal or factual questions include, *inter alia*:

(a)    Whether Defendant misrepresented that Huel Black was safe, healthy, and free from harmful ingredients;

(b)    Whether Defendant misrepresented that Huel Black met the strictest industry, quality, and safety standards;

(c)    Whether Defendant's practices in marketing, advertising and packaging Huel Black tend to mislead reasonable consumers into believing that the Products are free from harmful ingredients, such as lead and cadmium;

(d)    Whether Defendant engaged in false or misleading advertising;

(e)    Whether Defendant engaged in false or misleading advertising by selling, packaging, and/or marketing Huel Black containing lead and cadmium;

(f)    Whether Defendant engaged in deceptive trade practices by selling, packaging, advertising and/or marketing Huel Black containing lead and cadmium;

(g)    Whether Defendant engaged in unfair, unconscionable, or deceptive trade practices by selling and/or marketing Huel Black with the misrepresentations and omissions as described herein;

(h) Whether Plaintiffs and Class Members either paid a premium Huel Black that they would not have paid but for its false representations or would not have purchased them at all;

(i) Whether Plaintiffs and Class Members are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount of such damages;

(j) Whether Plaintiffs and Class Members have suffered an economic injury and the proper measure of their losses as a result of those injuries; and

(k) Whether Plaintiffs and Class Members are entitled to injunctive, declaratory, or other equitable relief.

140. *Adequate Representation*: Plaintiffs will fairly and adequately protect the interests of Class Members. They have no interests antagonistic to those of Class Members. Plaintiffs retained attorneys experienced in the prosecution of class actions, including consumer product, misrepresentation, and mislabeling class actions, and Plaintiffs intend to prosecute this action vigorously.

141. *Injunctive/Declaratory Relief*: The elements of Rule 23(b)(2) are met. Defendant will continue to commit the unlawful practices alleged herein, and Plaintiffs and Class Members will continue to be deceived by Defendant's misrepresentations and omissions and unknowingly be exposed to the risk of harm associated with lead and cadmium in Huel Black. Defendant has acted and refused to act on grounds that apply generally to the Class, such that final injunctive relief and corresponding declaratory relief is appropriate respecting the Class as a whole.

142. *Predominance and Superiority*: Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of Class Members' individual claims, it is likely that few Class Members

could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

143. Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

144. Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class.

## TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS

145. Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the presence of lead and cadmium in its Huel Black products and the misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and Class Members were deceived regarding Huel Black and could not reasonably discover that they contained lead and cadmium.

146. Plaintiffs and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to expect that the Defendant was concealing the presence of lead and cadmium in Huel Black. As alleged herein, the presence of lead and/or cadmium in Huel Black was material to Plaintiffs and Class Members at all relevant times. Within the time period of any applicable statute of limitations, Plaintiffs and Class Members would not

have discovered through the existence of reasonable diligence that Huel Black contain lead and cadmium.

147.    At all times, Defendant is and was under a continuous duty to disclose to Plaintiffs and the Class Members the true standard, quality, and grade of Huel Black and to disclose the presence of lead and cadmium due to its exclusive and superior knowledge of the contents and ingredient sourcing for Huel Black.

148.    Defendant knowingly, actively, and affirmatively concealed the facts alleged herein.  Plaintiffs and Class Members reasonably relied on Defendant's knowing, active, and affirmative concealment.

149.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statues of limitations in defense of this action.

## CAUSES OF ACTION

### COUNT I

### VIOLATIONS OF NEW YORK AGRICULTURE AND MARKETS LAW
(on behalf of a Nationwide Class)

150.    Plaintiffs re-allege and incorporate all other factual allegations set forth in this Complaint.

151.    New York Agriculture and Markets Law ("N.Y. Agric. & Mkts. Law") § 199-a prohibits persons and corporations from manufacturing or selling in this state "any article of food which is adulterated or misbranded within the meaning of this statute."

152.    Food is considered adulterated "[i]f it contains any poisonous or deleterious substance which may render it injurious to health" and/or if it "[i]f it falls below the standard of

purity, quality or strength which it purports or is represented to possess." N.Y. Agric. & Mkts. Law § 200(1), 200(11).

153.    Food is misbranded if its "labeling is false or misleading in any particular" or "If it purports to be or is represented as a food for which a definition and standard of identity has been prescribed." N.Y. Agric. & Mkts. Law § 201(1) 201(7).

154.    Defendant violates §199-a insofar as they manufacture and sell Huel Black, which is both adulterated and misbranded.

155.    Huel Black is "adulterated" because it contains lead and cadmium which may ordinarily render the Huel Black injurious to health and fell below the standard of quality that Defendant represented it possessed.

156.    Huel Black is "misbranded" because its fails to identify it contains high concentrations of lead and cadmium.

157.    On behalf of themselves and other members of the class, Plaintiffs seek actual damages, injunctive, and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the law.

## COUNT II

### UNJUST ENRICHMENT
### (on behalf of the Nationwide Class)

158.    Plaintiffs re-allege and incorporate all other factual allegations set forth in this Complaint.

159.    The financial benefits Defendant derived from its unlawful and inequitable conduct are directly traceable to Plaintiffs' and Class members' purchases of Huel Black, and those benefits were obtained as a direct and proximate result of Defendant's wrongful actions.

160.    Allowing Defendant to retain these ill-gotten gains would be inequitable, unconscionable, and unjust, as the benefits were procured through Defendant's wrongful conduct.

161.    On behalf of themselves and other members of the class, Plaintiffs seek equitable relief, including restitution and/or disgorgement of all revenues, profits, compensation, and other benefits Defendant obtained through these unlawful business practices.

## COUNT III

### VIOLATION OF FRAUD BY OMISSION
### (on behalf of All Subclasses Based on State Law)

162.    Plaintiffs re-allege and incorporate all other factual allegations set forth in this Complaint.

163.    Plaintiffs, Class Members and Defendant acted within the context of a business transaction when Plaintiffs and the Class Members purchased Huel Black for household use and not for resale.

164.    Plaintiffs and Class Members were ordinary non-business consumers.

165.    Defendant knew Huel Black contained lead and cadmium.

166.    Defendant knowingly concealed from and failed to disclose to Plaintiffs and the Class Members that Huel Black contained lead and cadmium.

167.    Defendant knew or should have known Huel Black did not have the quality, ingredients or standards as described herein because it contained lead and cadmium.

168.    Defendant has admitted the presence or material risk of lead and/or cadmium in Huel Black. Testing in the Report and performed by Huel also shows the presence of lead and cadmium in Huel Black.

169.    As a manufacturer of a meal replacement purported to be "meticulously" created from "highest quality sources," Defendant is in a special position of trust upon which Plaintiffs, the Class Members, and other reasonable consumers rely.

170.    Defendant was under a duty to disclose Huel Black's true quality, ingredients, and standards because:

    a.    Defendant had exclusive knowledge of its test results that showed Huel Black contained or had a material risk of containing lead and cadmium;

    b.    Defendant also had exclusive knowledge related to the manufacturing of Huel Black, including information related to quality control and its suppliers;

    c.    Defendant was aware it had superior knowledge regarding information not readily available to Plaintiffs and the Class Members that Huel Black did not have the quality and standards as advertised and that they contained lead and cadmium, without Defendant disclosing such information on Huel Black's packaging; and

    d.    Defendant was in a superior position to know the true facts about Huel Black's quality and standards and to know that, in fact, they contained lead and cadmium.

171.    Defendant failed to discharge its duty to disclose the presence of lead and cadmium in Huel Black.

172.    Defendant actively concealed or failed to disclose facts about Huel Black's quality, ingredients and standards and intended that Plaintiffs and the Class Members would rely on its omissions, concealment, and other deceptive conduct regarding Huel Black's quality, ingredients and standards when purchasing Huel Black, unaware of the undisclosed material facts.

173.    Defendant's omissions, concealment, and other deceptive conduct were made to deceive reasonable consumers about the Huel Black's quality and standards. Plaintiffs and the

Class Members relied on, and were in fact deceived by, Defendant's omissions, concealment, and other deceptive conduct with respect to the Huel Black' quality, ingredients and standards.

174.    Defendant knows its customers trust the quality of Huel Black and that they expect Huel Black to be free of lead and cadmium. Defendant has intentionally and knowingly positioned itself in the market as a manufacturers of premium vegan protein products made of superior ingredients for which consumers will pay a premium.

175.    The facts concealed or not disclosed by Defendant were material facts in that Plaintiffs, the Class Members, and other reasonable consumers would have considered them when deciding whether to purchase Huel Black. Had Plaintiffs and the Class Members known Huel Black did not have the quality, ingredients and standards as advertised by Defendant and heavy metals they would not have purchased the Huel Black or paid a premium price.

176.    Defendant knowingly concealed that the Huel Black contained lead and cadmium, with the intent to defraud and deceive Plaintiffs and the Class Members.

177.    As a direct and proximate result of Defendant's omissions, concealment, and other deceptive conduct, Plaintiffs and the class members suffered actual damages in that they purchased Huel Black that was worth less than the price they paid and that they would not have purchased at all had they known the Huel Black contained lead and cadmium.

178.    On behalf of themselves and other members of the classes, Plaintiffs seek actual damages, injunctive, and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## COUNT IV

## VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW §§ 349, 350
### (on behalf of the New York Subclass)

179.    Plaintiffs Tal, Tinkle, and Baltazar re-allege and incorporate all other factual allegations set forth in this Complaint.

180.    New York Gen. Bus. Law § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" and allows Plaintiff and each member of the proposed class to recover "actual damages or fifty dollars, whichever is greater" per violation.

181.    New York Gen. Bus. Law § 350 further declares unlawful "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state" and allows Plaintiff and each member of the proposed class to recover "actual damages or five hundred dollars, whichever is greater" per violation.

182.    As described above, while engaging in consumer-oriented trade or commerce within the State of New York during the time period relevant hereto, Defendant mislead consumers about Huel Black by omitting that it contained lead and cadmium and instead telling consumers Huel Black is:

   a.  a healthy product that was "rigorously tested" for heavy metals and "validated for quality and nutrition" to meet Huel's "strict standards," including that the products are free from harmful heavy metals;

   b.  "safe for children above 4 years of age" and "fine to have during pregnancy" even though these populations are most vulnerable to the serious adverse health effects known to be associated with exposure to or consumption of lead and cadmium;

   c.  designed for "**maximum health** and taste. **Our Milton Keynes facility and global partners uphold the highest standards, with rigorous ingredient testing** ensuring consistent quality, flavor, and nutrition in every meal;"

   d.  a product that meet the "highest safety standards and regulations;"

e. "developed by a team of experienced Nutritionists and Product Development Specialists.  They are produced using the best ingredients in facilities that meet the strictest quality standards.  All our facilities and equipment are held to the highest safety standards and regulations, so you can be sure you'll be consuming top-quality nutrition;"

f. subject to "rigorous testing . . . to ensure every product meets our strict requirements;"

g. "routinely tested for micro, allergens, heavy metals, and pesticides. We have sampling teams in the UK and US, using certified labs UKAS and FDA-compliant standards. Our in-house NIR tech also enables advanced quality testing when needed."

h. "results for lead, cadmium, arsenic, and mercury have been consistent: **safe, stable, and well within global standards.**

183.    The foregoing deceptive acts and practices were directed at consumers and the public.

184.    As a result of Defendant's false, misleading, and deceptive misrepresentations and omissions, Plaintiffs Tal, Tinkle, and Baltazar and the members of the New York Subclass have suffered and continue to suffer economic injury.

185.    Plaintiffs Tal, Tinkle, and Baltazar and members of the New York Subclass suffered an ascertainable loss caused by Huel's misrepresentations.

186.    On behalf of himself and other members of the New York Subclass, Plaintiff Tal seeks to enjoin the unlawful acts and practices described herein, to recover actual damages or Five hundred and fifty dollars, whichever is greater, three-times actual damages, and reasonable attorneys' fees.

## COUNT V

### VIOLATIONS OF THE UNFAIR COMPETITION LAW,
### CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, *et seq*.,
### (on behalf of the California Subclass)

187.    Plaintiffs Ancel, Raymond, and Lin re-allege and incorporate all other factual allegations set forth in this Complaint.

188.    The Unfair Competition Law ("UCL") prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

189.    Defendants' failure to make the required Prop 65 disclosures with regard to the lead and cadmium concentrations in its Huel Black products satisfies the unlawful prong of the UCL. Defendant's marketing and advertisements violated the CLRA, California Business & Professions Code §§ 1750, *et seq*. and the False Advertising Law, California Business & Professions Code §§ 17500, *et seq.*

190.    Defendant's conduct describe herein was also fraudulent.  A statement or practice is fraudulent under the UCL if it is likely to deceive a significant portion of the public, applying an objective reasonable consumer test.

191.    Defendant's failure to disclose that Huel Black contained lead and cadmium and misrepresentations that Huel Black is:

a.    a healthy product that was "rigorously tested" for heavy metals and "validated for quality and nutrition" to meet Huel's "strict standards," including that the products are free from harmful heavy metals;

b.    "safe for children above 4 years of age" and "fine to have during pregnancy" even though these populations are most vulnerable to the serious adverse health effects known to be associated with exposure to or consumption of lead and cadmium;

    c.   designed for "**maximum health** and taste. **Our Milton Keynes facility and global partners uphold the highest standards, with rigorous ingredient testing** ensuring consistent quality, flavor, and nutrition in every meal;"

    d.   a product that meet the "highest safety standards and regulations;"

    e.   "developed by a team of experienced Nutritionists and Product Development Specialists.  They are produced using the best ingredients in facilities that meet the strictest quality standards.  All our facilities and equipment are held to the highest safety standards and regulations, so you can be sure you'll be consuming top-quality nutrition;"

    f.   subject to "rigorous testing . . . to ensure every product meets our strict requirements;"

    g.   "routinely tested for micro, allergens, heavy metals, and pesticides. We have sampling teams in the UK and US, using certified labs UKAS and FDA-compliant standards. Our in-house NIR tech also enables advanced quality testing when needed."

    h.   "results for lead, cadmium, arsenic, and mercury have been consistent:  **safe, stable, and well within global standards.**

are likely to deceive reasonable consumers and the public.

192.    Defendant's marketing mislead consumers by failing to disclose the products contained lead and cadmium.

193.    Defendant's conduct with respect to the labeling, packaging, advertising, marketing, and sale of Huel Black was unfair because Defendant's conduct offends an established public policy and/or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

194.    Defendant's conduct with respect to the labeling, packaging, advertising, marketing, and sale of Huel Black is also unfair because the injury is not outweighed by benefits to consumers or competition, and not one that consumers themselves can reasonably avoid. The profits obtained by Defendant through the misleading labeling does not outweigh the harm to Plaintiff and members of the Class who were deceived into purchasing Huel Black unaware that

they contain lead and cadmium, that are harmful to their health.  Consumers could not have reasonably avoided the harm absent conducting their own laboratory testing, which is not a reasonable expectation.  The harm could have easily been avoided by disclosing to consumers that Huel Black contain lead and cadmium.

195.    Defendant profited from the sale of the falsely, deceptively, and unlawfully advertised Protein Products to consumers.

196.    Plaintiffs Ancel, Raymond, and Lin, and other members of the Class, are likely to continue to be damaged by Defendant's unlawful, unfair, and/or fraudulent acts or practices because Defendant continues to disseminate misleading information making injunctive relief proper.

197.    Defendant's conduct caused and continues to cause substantial injury to Plaintiff and the other members of the Class. Plaintiffs Ancel, Raymond, and Lin each suffered injury in fact as a result of Defendant's unlawful conduct.

198.    In accordance with California Business & Professions Code section 17203, Plaintiffs Ancel, Raymond, and Lin seek an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices.

199.    Plaintiffs Ancel, Raymond, and Lin also seek an order for the restitution of all monies from the sale of Huel Black that were unjustly acquired through acts of unlawful competition.

200.    Because Plaintiffs' claims under the "unfair" prong of the UCL sweep more broadly than their claims under the FAL, CLRA, or UCL's "fraudulent" prong, Plaintiffs' legal remedies are inadequate to fully compensate Plaintiffs for all of Defendant's behavior.

## COUNT VI

### VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW, CALIFORNIA BUSINESS & PROFESSIONS CODE § 17500, *et seq.*, (on behalf of the California Subclass)

201.    Plaintiffs Ancel, Raymond, and Lin re-allege and incorporate all other factual allegations set forth in this Complaint.

202.    The FAL provides "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

203.    It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id*.

204.    As alleged herein, specifically, Defendant misleadingly marketed to reasonable consumers that Huel Black did not contain heavy metals through its representations that Huel Black was "meticulously" created from "highest quality sources" while failing to disclose it contained high concentrations on lead and cadmium.  Plaintiffs Ancel, Raymond, and Lin each suffered injury in fact as a result of Defendant's actions as set forth herein because Plaintiffs Ancel, Raymond, and Lin purchased Huel Black in reliance on Defendant's false and misleading marketing claims.

205.    Defendant's business practices as alleged herein constitute unfair, deceptive, untrue, and misleading advertising pursuant to the FAL because Defendant advertised Huel Black in a untrue and misleading manner, which Defendant knew or reasonably should have known.

Specifically, Defendant mislead consumers about Huel Black by omitting that it contained lead and cadmium and instead telling consumers Huel Black is:

    a.   a healthy product that was "rigorously tested" for heavy metals and "validated for quality and nutrition" to meet Huel's "strict standards," including that the products are free from harmful heavy metals;

    b.   "safe for children above 4 years of age" and "fine to have during pregnancy" even though these populations are most vulnerable to the serious adverse health effects known to be associated with exposure to or consumption of lead and cadmium;

    c.   designed for "**maximum health** and taste. **Our Milton Keynes facility and global partners uphold the highest standards, with rigorous ingredient testing** ensuring consistent quality, flavor, and nutrition in every meal;"

    d.   a product that meet the "highest safety standards and regulations;"

    e.   "developed by a team of experienced Nutritionists and Product Development Specialists.  They are produced using the best ingredients in facilities that meet the strictest quality standards.  All our facilities and equipment are held to the highest safety standards and regulations, so you can be sure you'll be consuming top-quality nutrition;"

    f.   subject to "rigorous testing . . . to ensure every product meets our strict requirements;"

    g.   "routinely tested for micro, allergens, heavy metals, and pesticides. We have sampling teams in the UK and US, using certified labs UKAS and FDA-compliant standards. Our in-house NIR tech also enables advanced quality testing when needed."

    h.   "results for lead, cadmium, arsenic, and mercury have been consistent: **safe, stable, and well within global standards.**

206.    Defendant profited from the sale of the falsely and deceptively advertised Protein Products to consumers.

207.    As a result, Plaintiffs Ancel, Raymond, and Lin, members of the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendant was unjustly enriched.

208.    Pursuant to California Business and Professions Code § 17535, Plaintiffs, on behalf of themselves and members of the Class, seek an order enjoining Defendant from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

## COUNT VII

### VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. § 501.204(1)
### (on behalf of the Florida Subclass)

209.    Plaintiffs Traynor and Rosen re-allege and incorporate all other factual allegations set forth in this Complaint.

210.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204(1).

211.    As described above, while engaging in consumer-oriented trade or commerce within the State of Florida during the time period relevant hereto, Defendant marketed, manufactured and sold Huel Black omitting that it contained lead and cadmium and instead telling consumers Huel Black is:

    a.  a healthy product that was "rigorously tested" for heavy metals and "validated for quality and nutrition" to meet Huel's "strict standards," including that the products are free from harmful heavy metals;

    b.  "safe for children above 4 years of age" and "fine to have during pregnancy" even though these populations are most vulnerable to the serious adverse health effects known to be associated with exposure to or consumption of lead and cadmium;

    c.  designed for "**maximum health** and taste. **Our Milton Keynes facility and global partners uphold the highest standards, with rigorous ingredient testing** ensuring consistent quality, flavor, and nutrition in every meal;"

    d.  a product that meet the "highest safety standards and regulations;"

e. "developed by a team of experienced Nutritionists and Product Development Specialists. They are produced using the best ingredients in facilities that meet the strictest quality standards. All our facilities and equipment are held to the highest safety standards and regulations, so you can be sure you'll be consuming top-quality nutrition;"

f. subject to "rigorous testing . . . to ensure every product meets our strict requirements;"

g. "routinely tested for micro, allergens, heavy metals, and pesticides. We have sampling teams in the UK and US, using certified labs UKAS and FDA-compliant standards. Our in-house NIR tech also enables advanced quality testing when needed."

h. "results for lead, cadmium, arsenic, and mercury have been consistent: **safe, stable, and well within global standards.**

212. The foregoing deceptive acts and practices were directed at consumers and the public.

213. As a result of Defendant's false, misleading, and deceptive misrepresentations and omissions, Plaintiffs Traynor and Rosen and the members of the Florida Subclass have suffered and continue to suffer economic injury.

214. Huel's conduct, as alleged herein, was likely to deceive a consumer acting reasonably in the same circumstances, and that conduct caused actual damages to Plaintiffs Traynor and Rosen and members of the Florida Subclass.

215. Plaintiffs Traynor and Rosen, on behalf of themselves and the Florida Subclass, seeks damages, injunctive relief, other equitable relief, costs, and attorneys' fees as permitted by Fla. Stat. § 501.211 and § 501.2105.

## COUNT VIII

## VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT
### (on behalf of the New Jersey Subclass)

216.    Plaintiff Victor Torres-Velez re-alleges and incorporates all other factual allegations set forth in this Complaint.

217.    Defendant is a "person" as defined in the New Jersey Consumer Fraud Act ("NJCFA"). N.J.S.A. § 56:8-1(d).

218.    Huel Black is "merchandise" as defined by the NJCFA.  N.J. Stat. Ann. 56:8-1(c).

219.    The NJCFA states in pertinent part: "The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practices...." N.J.S.A. §56:8-2. 187.

220.    While engaging in trade or commerce within the State of New Jersey during the time period relevant hereto, Defendant mislead consumers about Huel Black by omitting that it contained lead and cadmium and instead telling consumers Huel Black is:

   a.    a healthy product that was "rigorously tested" for heavy metals and "validated for quality and nutrition" to meet Huel's "strict standards," including that the products are free from harmful heavy metals;

   b.    "safe for children above 4 years of age" and "fine to have during pregnancy" even though these populations are most vulnerable to the serious adverse health effects known to be associated with exposure to or consumption of lead and cadmium;

   c.    designed for "**maximum health** and taste. **Our Milton Keynes facility and global partners uphold the highest standards, with rigorous ingredient testing** ensuring consistent quality, flavor, and nutrition in every meal;"

    d.   a product that meet the "highest safety standards and regulations;"

    e.   "developed by a team of experienced Nutritionists and Product Development Specialists.  They are produced using the best ingredients in facilities that meet the strictest quality standards.  All our facilities and equipment are held to the highest safety standards and regulations, so you can be sure you'll be consuming top-quality nutrition;"

    f.   subject to "rigorous testing . . . to ensure every product meets our strict requirements;"

    g.   "routinely tested for micro, allergens, heavy metals, and pesticides. We have sampling teams in the UK and US, using certified labs UKAS and FDA-compliant standards. Our in-house NIR tech also enables advanced quality testing when needed."

    h.   "results for lead, cadmium, arsenic, and mercury have been consistent: **safe, stable, and well within global standards**" (emphasis in original).

221.    Plaintiff Torres-Velez and the New Jersey Subclass have been and continue to be injured as a direct and proximate result of Huel's violations of the NJCFA.

222.    Plaintiff Torres-Velez and the New Jersey Subclass are entitled to pursue a claim against Huel pursuant to N.J.S.A. §§56:8-2.11, 56:8-2.12 and/or 56:8-19 for damages, treble damages, equitable relief, and attorney's fees and costs to remedy Huel's violations of the NJCFA.

### COUNT IX

### VIOLATIONS OF THE NORTH CAROLINA
### UNFAIR AND DECEPTIVE TRADE PRACTICES ACT,
### (on behalf of the North Carolina subclass)

223.    Plaintiff Latane re-alleges and incorporates all other factual allegations set forth in this Complaint.

224.    The North Carolina Unfair and Deceptive Trade Practices Act ("NC UDTPA") declares unlawful any "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a).

225.    Defendant's conduct as alleged herein is "in or affecting commerce" under N.C. Gen. Stat. § 75-1.1(a).

226.    While engaging in trade or commerce within North Carolina during the time period relevant hereto, Defendant mislead consumers about Huel Black by omitting that it contained lead and cadmium and instead telling consumers Huel Black is:

    a.  a healthy product that was "rigorously tested" for heavy metals and "validated for quality and nutrition" to meet Huel's "strict standards," including that the products are free from harmful heavy metals;

    b.  "safe for children above 4 years of age" and "fine to have during pregnancy" even though these populations are most vulnerable to the serious adverse health effects known to be associated with exposure to or consumption of lead and cadmium;

    c.  designed for "**maximum health** and taste. **Our Milton Keynes facility and global partners uphold the highest standards, with rigorous ingredient testing** ensuring consistent quality, flavor, and nutrition in every meal;"

    d.  a product that meet the "highest safety standards and regulations;"

    e.  "developed by a team of experienced Nutritionists and Product Development Specialists.  They are produced using the best ingredients in facilities that meet the strictest quality standards.  All our facilities and equipment are held to the highest safety standards and regulations, so you can be sure you'll be consuming top-quality nutrition;"

    f.  subject to "rigorous testing . . . to ensure every product meets our strict requirements;"

    g.  "routinely tested for micro, allergens, heavy metals, and pesticides. We have sampling teams in the UK and US, using certified labs UKAS and FDA-compliant standards. Our in-house NIR tech also enables advanced quality testing when needed."

    h.  "results for lead, cadmium, arsenic, and mercury have been consistent:  **safe, stable, and well within global standards**" (emphasis in original).

227.    Plaintiff Latane and the other members of the North Carolina Subclass have been and continue to be injured as a direct and proximate result of Defendant's violations of the NC UDTPA.

228.    Plaintiff Latane and the members of the North Carolina Subclass are entitled to seek actual damages and treble damages pursuant to N.C. Gen. Stat. § 75-16. 232.  Plaintiff Latane and the other members of the North Carolina Subclass are also entitled to seek attorney's fees pursuant to N.C. Gen. Stat. § 75-16.1.

**COUNT X**

**VIOLATION OF SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT**
**(on behalf of South Dakota Subclass)**

229.    Plaintiff Kaiser re-alleges and incorporates all other factual allegations set forth in this Complaint.

230.    Plaintiff Kaiser is a "person" as defined in the South Dakota Deceptive Trade Practices and Consumer Protection Act ("SD DTPCPA").  S.D. Codified Laws § 37-24-1.

231.    Huel Black is "merchandise" as defined in SD DTPCPA. S.D. Codified Laws § 37-24-1.

232.    The SD DTPCPA states in pertinent part it is "a deceptive act or practice for any person to: Knowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise or the solicitation of contributions for charitable purposes, regardless of whether any person has in fact been misled, deceived, or damaged thereby" S.D. Codified Laws § 37-24-6.

233.    While engaging in trade or commerce within South Dakota during the time period relevant hereto, Defendant mislead consumers about Huel Black by omitting that it contained lead and cadmium and instead telling consumers Huel Black is:

    a.   a healthy product that was "rigorously tested" for heavy metals and "validated for quality and nutrition" to meet Huel's "strict standards," including that the products are free from harmful heavy metals;

    b.   "safe for children above 4 years of age" and "fine to have during pregnancy" even though these populations are most vulnerable to the serious adverse health effects known to be associated with exposure to or consumption of lead and cadmium;

    c.   designed for "**maximum health** and taste. **Our Milton Keynes facility and global partners uphold the highest standards, with rigorous ingredient testing** ensuring consistent quality, flavor, and nutrition in every meal;"

    d.   a product that meet the "highest safety standards and regulations;"

    e.   "developed by a team of experienced Nutritionists and Product Development Specialists.  They are produced using the best ingredients in facilities that meet the strictest quality standards.  All our facilities and equipment are held to the highest safety standards and regulations, so you can be sure you'll be consuming top-quality nutrition;"

    f.   subject to "rigorous testing . . . to ensure every product meets our strict requirements;"

    g.   "routinely tested for micro, allergens, heavy metals, and pesticides. We have sampling teams in the UK and US, using certified labs UKAS and FDA-compliant standards. Our in-house NIR tech also enables advanced quality testing when needed."

    h.   "results for lead, cadmium, arsenic, and mercury have been consistent:  **safe, stable, and well within global standards.**" (emphasis in original)

234.    Plaintiff Latane and the members of the South Dakota Subclass are entitled to seek actual damages pursuant to S.D. Codified Laws § 37-24-31.

## COUNT XI

## VIOLATION OF THE NEVADA DECEPTIVE PRACTICES ACT
### (on behalf of the Nevada Subclass)

235.    Plaintiff Hsu re-alleges and incorporates all other factual allegations set forth in this Complaint.

236.    Plaintiff Hsu is a "victim of consumer fraud" within the meaning of Nev. Rev. Stat. § 41.600(1), in that he purchased Huel Black as a result of Defendants' deceptive trade practices.

237.    At all relevant times, Defendant was acting in the course of its business selling Huel Black to members of the public, including Plaintiff Hsu and the Class.

238.    Nev. Rev. Stat. § 41.600 authorizes a civil action for damages and equitable relief by any person who is a victim of consumer fraud, including deceptive trade practices as defined in Nev. Rev. Stat. §§ 598.0915–598.0925.

239.    Defendant engaged in deceptive trade practices in violation of the Nevada Consumer Fraud statutes, including but not limited to:

a.    Representing that Huel Black had characteristics, benefits, or qualities they did not have, in violation of Nev. Rev. Stat. § 598.0915(5); and

b.    Representing that Huel Black was of a particular standard, quality or grade, knowing it was of another standard, quality, grade, style or model, in violation of Nev. Rev. Stat. § 598.0923(7).

240.    While engaging in trade or commerce within Nevada, Defendant mislead consumers about Huel Black by omitting that it contained lead and cadmium and instead telling consumers Huel Black is:

a.    a healthy product that was "rigorously tested" for heavy metals and "validated for quality and nutrition" to meet Huel's "strict standards," including that the products are free from harmful heavy metals;

b. "safe for children above 4 years of age" and "fine to have during pregnancy" even though these populations are most vulnerable to the serious adverse health effects known to be associated with exposure to or consumption of lead and cadmium;

c. designed for "**maximum health** and taste. **Our Milton Keynes facility and global partners uphold the highest standards, with rigorous ingredient testing** ensuring consistent quality, flavor, and nutrition in every meal;"

d. a product that meet the "highest safety standards and regulations;"

e. "developed by a team of experienced Nutritionists and Product Development Specialists.  They are produced using the best ingredients in facilities that meet the strictest quality standards.  All our facilities and equipment are held to the highest safety standards and regulations, so you can be sure you'll be consuming top-quality nutrition;"

f. subject to "rigorous testing . . . to ensure every product meets our strict requirements;"

g. "routinely tested for micro, allergens, heavy metals, and pesticides. We have sampling teams in the UK and US, using certified labs UKAS and FDA-compliant standards. Our in-house NIR tech also enables advanced quality testing when needed;" and

h. "results for lead, cadmium, arsenic, and mercury have been consistent:  **safe, stable, and well within global standards**" (emphasis in original).

241.    Plaintiff Hsu viewed and reasonably relied on Defendant's representations and omissions when choosing to purchase the Huel Black.  Had Plaintiff Hsu known the truth, he would not have purchased Huel Black, or would have paid less for it.

242.    As a direct and proximate result of Defendant's deceptive trade practices, Plaintiff Hsu and Class Members suffered ascertainable losses, including monetary damages in the amounts paid for the Products.

243.    Pursuant to Nev. Rev. Stat. § 41.600(3), Plaintiff Hsu seeks all available damages, equitable relief, restitution, injunctive relief preventing Defendant from continuing its unlawful conduct, reasonable attorneys' fees, and any other relief the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, individually and on behalf of all other members of the proposed Nationwide Class and/or Subclasses, respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendant as follows:

A.        Declaring, adjudging, and decreeing that this action is a proper class action, and certifying the proposed Class and/or Subclasses pursuant to Federal Rule of Civil Procedure 23, including designating Plaintiffs as Class Representatives and appointing Plaintiffs' counsel as Class Counsel;

B.        Awarding Plaintiffs and the Classes appropriate monetary relief, including actual damages; statutory damages; consequential damages; punitive damages; exemplary damages; nominal damages; restitution; and disgorgement of all earnings, interest, profits, compensation, and benefits received as a result of its unlawful acts, omissions, and practices;

C.        Awarding Plaintiffs and the Classes equitable, injunctive, and declaratory relief as may be appropriate to protect the interests of Plaintiffs and Class Members, including but not limited to an Order enjoining Defendant from engaging in the wrongful and unlawful conduct complained of herein;

D.        Compelling Defendant to pay the costs associated with notification of Class Members about the judgment and administration of claims;

E.        Awarding Plaintiffs and the Classes pre-judgment and post-judgment interest to the maximum extent allowable;

F.        Awarding Plaintiffs and the Classes reasonable attorneys' fees, costs, and expenses; and

G.      Awarding Plaintiffs and the Classes such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiffs, individually and on behalf of the Class and/or Subclasses, hereby demand a trial by jury of all issues in this Complaint so triable.


Dated: November 24, 2025                    Respectfully submitted,

                                            s/  *Christopher A. Seeger*

                                            Christopher A. Seeger
                                            Stephen A. Weiss
                                            Justin M. Smigelsky
                                            **SEEGER WEISS LLP**
                                            55 Challenger Road, 6th Floor
                                            Ridgefield Park, New Jersey 07660
                                            Telephone: (973) 639-9100
                                            Facsimile: (973) 639-9393
                                            cseeger@seegerweiss.com
                                            sweiss@seegerweiss.com
                                            jsmigelsky@seegerweiss.com


                                            Kelly L. Tucker (*pro hac vice* forthcoming)
                                            Jennifer Sarnelli
                                            **GRANT & EISENHOFER P.A.**
                                            123 Justison Street
                                            Wilmington, DE 19801
                                            Telephone: (302) 622-7000
                                            Facsimile: (302) 622-7100
                                            ktucker@gelaw.com
                                            jsarnelli@gelaw.com

                                            *Attorneys for Plaintiffs and the Proposed Class*

60